UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA WESTFALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1857 ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Christina Westfall brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Westfall's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform her past relevant work.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I.  Procedural History

Westfall filed her applications for benefits on May 13, 2019.   (Tr. 197-215.)   She

claimed she became unable to work on May 1, 2019, due to bipolar disorder, schizophrenia, problems sleeping, and hypertension.   (Tr. 209, 216, 244.)   Westfall was 50 years of age at her alleged onset of disability date.   Her applications were denied initially.   (Tr. 131-37.) Westfall's claims were denied by an ALJ on June 11, 2020.   (Tr. 55-71.)   On October 27, 2020, the Appeals Council denied Westfall's claim for review.   (Tr. 1-4.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Westfall raises the following arguments: (1) the ALJ "improperly discredited Plaintiff's subjective complaints based upon unsupported conclusions;" (2) the RFC "is not supported by substantial evidence;" (3) "the opinion evidence was not properly evaluated;" (4) the ALJ "failed to properly consider the issue of failure to follow prescribed treatment;" and (5) the ALJ "failed to properly consider whether plaintiff was justified in not following prescribed treatment."   (Doc. 25 at 4, 8, 10, 11, 13.)

## II.  The ALJ's Determination

The ALJ first found that Westfall met the insured status requirements of the Social Security Act through June 30, 2019.   (Tr. 60.)   She stated that Westfall has not engaged in substantial gainful activity since her alleged onset date.   *Id.*   In addition, the ALJ concluded that Westfall had the following severe impairment: schizoaffective disorder, bipolar type.   *Id.*   The ALJ found that Westfall did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.   (Tr. 61.)

As to Westfall's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple routine

> repetitive tasks, but who has sufficient concentration to persist in
> the performance of such tasks at an appropriate pace with standard
> breaks, with few changes in work setting, not at a production rate
> pace (so no assembly line work) only simple work related
> judgments, with only occasional interactions with supervisors and
> coworkers, no work with the general public, no tandem tasks.

(Tr. 62.)

The ALJ found that Westfall was capable of performing her past relevant work as a stores

laborer.   (Tr. 68.)   The ALJ therefore concluded that Westfall was not under a disability, as

defined in the Social Security Act, from May 1, 2019, through the date of the decision.   (Tr. 70.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on May 10, 2019, the claimant
> is not disabled under sections 216(i) and 223(d) of the Social
> Security Act.
>
> Based on the application for supplemental security income
> protectively field on May 10, 2019, the claimant is not disabled
> under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 70-71.)

## III.   Applicable Law

### III.A.   Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as

a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."  *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability

remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

As previously noted, Westfall raises five claims.   The undersigned will discuss them in turn, beginning with the ALJ's evaluation of Westfall's subjective complaints.

1.  **Subjective Complaints**

Westfall first argues that the ALJ's evaluation of her subjective complaints is deficient, in that the ALJ failed to explain how the evidence is inconsistent with Westfall's subjective symptoms.

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.[1] *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).   In doing so, the ALJ must consider the claimant's prior work record and third-party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.   *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   The ALJ is not mechanically obligated to discuss each of the above factors, however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence.   *Vick v. Saul*, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Grba-Craghead v. Astrue*, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)).   On review by the court, "[c]redibility determinations are the province of the ALJ." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin v. Colvin*,

---

[1]Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints.   However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged."   SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

826 F.3d 1082, 1086 (8th Cir. 2016)).   The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility."   *Id.*

The ALJ summarized Westfall's testimony regarding her limitations as follows, in relevant part:

> In her function report, she noted she lived alone in a house and spent a typical day going for a walk, watching television and reading a book.   She asserted difficulty lifting, remembering things, completing tasks, concentrating, understanding, getting along with others including authority figures, handling stress.   She noted she did not drive because she did not have a license and did not spend time with others.   The claimant indicated that she was capable of managing her personal care independently, doing household chores, preparing meals, going out alone, shopping in stores, managing her finances, walking, reading, watching television, handling changes in her routine…At the hearing, the claimant indicated that she lived alone, managed her personal care without help, did all the household chores, shopping and cooking for herself.

(Tr. 63.)

The ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.   *Id.*   The Court finds that the ALJ appropriately considered Westfall's subjective allegations.

The ALJ first noted that Westfall reported that she stopped working on July 30, 2014, yet asserted that she became unable to work five years later in May 2019.   (Tr. 63.)   The fact that Westfall stopped working for reasons other than her alleged disability detracts from her credibility.   *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (finding it relevant to credibility that claimant leaves work for reasons other than for claimant's medical condition).

Next, the ALJ discussed the objective medical evidence and found it was not entirely supportive of Westfall's subjective complaints.[2]

A summary of the medical evidence discussed by the ALJ is provided below:

Westfall was hospitalized at Center Pointe Hospital from April 5, 2019, through April 11, 2019, due to increased auditory and visual hallucinations.   (Tr. 63, 325.)   Westfall reported that she had been hearing voices of God and the devil since her preteen years.   (Tr. 325.)   She also reported an increase in mood swings, irritability, and insomnia.   *Id.*   Westfall indicated that she had been hospitalized in her 20s or early 30s, and had not received any psychiatric treatment since then.   (Tr. 329.)   She reported a history of substance abuse, noting she would smoke marijuana daily if she could afford it, but seldom smoked due to lack of finances.   *Id.*   She drank four to five airplane bottes of alcohol prior to coming to the hospital, and admitted that she had been "self-medicating for over 20 years."   *Id.*   Westfall had worked a variety of jobs and "done quite well."   (Tr. 330.)   On examination, Westfall became tearful very easily when discussing her problems; was "a bit" tangential, but her thought process was mostly logical and intact; she denied paranoia, but exhibited low self-esteem and some feelings of hopelessness; her mood was depressed, irritable, and anxious; her affect was labile; her memory was intact; her intellect was assessed as average to low average; her concentration was impaired as she was unable to complete serial sevens; and her insight and judgment were fair to limited as evidenced by her "managing for 20 years with limited support, working, raising her children and struggling too with her psychosis."   (Tr. 330-31.)   Westfall was diagnosed with schizoaffective disorder, and was admitted to the behavioral unit for stabilization, medication adjustment, and safety

---

[2]The undersigned notes that, although Westfall alleged physical impairments in addition to her mental impairments, she does not challenge the ALJ's finding that her physical impairments were non-severe.   As such, the Court's discussion will focus on Westfall's mental impairments.

monitoring.   (Tr. 325.)   During the course of her hospital stay, her psychiatric medications were adjusted.   *Id.*   Westfall reported an improvement in her mood and anxiety levels at discharge, and she denied any hallucinations.   *Id.*

Westfall presented to primary care nurse practitioner Kristen Herina on May 6, 2019, at which time she denied hallucinations, hearing voices, depression, suicidal ideation, flight of ideas, and racing thoughts.   (Tr. 64, 552.)   Ms. Herina noted that Westfall had been hospitalized at Center Pointe the previous month and had been diagnosed with schizoaffective disorder and started on Abilify.[3]   Westfall admitted that she had been hearing voices for several months, but did not report this to Ms. Herina.   *Id.*   On examination, Westfall's mood, affect, behavior, judgment, and thought content were all normal.   (Tr. 553.)   Ms. Herina refilled the Abilify and prescribed Trazodone.[4]   *Id.*

Westfall underwent a psychiatric evaluation with Kim D. McMillian, PMHNP-BC, at Compass Health Network on May 21, 2019.   (Tr. 64, 334-39.)   Westfall reported that her anxiety was "bad" over the past four to five months, she experienced panic attacks most days, she had been seeing people that are not there since childhood, she hears voices, she experiences periods of excess energy and elation about every other week, she has times of low mood and low energy, and her sleep is fragmented.   (Tr. 334-35.)   She had a history of heavy alcohol usage and marijuana usage, and had last used marijuana the day prior.   (Tr. 335.)   Westfall had never had any therapy.   *Id.*   Upon examination, Westfall was alert, pleasant, cooperative, engaged, well-groomed, exhibited good eye contact, her speech was normal and coherent, her insight into

---

[3]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder, schizophrenia, and depression.   *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

[4]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders.   *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

her mental illness was fair, her judgment was fair, her thought process was linear and organized, her recent and remote memory were grossly intact, her attention was grossly intact, her fund of knowledge was within normal limits, and her intelligence appeared average, her affect was anxious and appropriate to content, she was without auditory or visual hallucinations or paranoia, and she denied suicidal or homicidal ideation.  (Tr. 337.)  Ms. McMillian diagnosed Westfall with stable or improved schizoaffective disorder, bipolar type.  (Tr. 338.)  She continued Westfall's Abilify and Trazodone, and started her on Trintellix[5] for anxiety and depression.  *Id.*

At Westfall's follow-up appointment with Ms. Herina on May 22, 2019, Westfall was compliant with her medication therapy and was "doing well and without complaints."  (Tr. 64, 556.)  She denied hallucinations, hearing voices, and depression, although anxiety was present. *Id.*  Ms. Herina found that Westfall's schizoaffective disorder was stable.  (Tr. 572.)  On July 10, 2019, Westfall returned for follow-up.  (Tr. 64, 341.)  Westfall indicated that her energy was "fair-low," her concentration varied, and she denied suicidal ideation.  (Tr. 341.)  She reported experiencing mood swings, and hearing voices, which she described as "mumbles."  *Id.* She had not been taking her Abilify because she was unable to afford the medication.  *Id.* Upon examination, Westfall was alert, pleasant, cooperative, engaged, well-groomed, exhibited good eye contact, her speech was coherent, her insight and judgment were fair, her thought process was goal-directed and organized, her recent and remote memory were grossly intact, her attention was grossly intact, her stated mood was "okay," her affect was full range and appropriate, and she had auditory hallucinations.  (Tr. 342.)  Ms. McMillian gave Westfall

---

[5]Trintellix is an antidepressant drug indicated for the treatment of depression.  *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

samples of Abilify and Tintellix, and instructed her on the importance of taking medications as prescribed.  (Tr. 343.)

On July 26, 2019, Westfall underwent a psychological evaluation for Medicaid determination purposes with Thomas Spencer, Psy.D.  (Tr. 65, 352-55.)  She reported that she had not experienced hallucinations in a long time, but she did hear a "mumbling."  (Tr. 352.) Westfall indicated that she received inpatient treatment at Center Pointe for "an addiction to smoking pot," at which time she was diagnosed with schizoaffective disorder and was prescribed Abilify. *Id.*  She reported that she quit her job at Hardee's five years prior because she was unable to deal with the people.  *Id.*  Westfall reported experiencing panic attacks when she is around large groups of people, although she was able to shop at her local stores and visit with friends and family at her home.  *Id.*  Dr. Spencer noted that Westfall maintains her activities of daily living and does so independently.  *Id.*  Upon examination, Westfall's hygiene was normal, she exhibited good eye contact, she was cooperative, her speech was normal, her self-described mood was "a little bit sad," her affect was despondent and dysphoric, her flow of thought was intact and relevant, she reported experiencing "mumbling and some shadows," her insight and judgment were "fairly intact," and her immediate and recent memory were normal.  (Tr. 353-54.)  Dr. Spencer diagnosed Westfall with schizoaffective disorder and cannabis use disorder. (Tr. 355.)  He expressed the opinion that Westfall has a "mental disability which prevents her from engaging in employment or gainful activity for which her age, training, and experience or education will fit her."  *Id.*

Westfall returned for follow-up at Compass on September 4, 2019, at which time she reported her mood was "okay," although she continued to experience anxiety and low energy. (Tr. 65, 420.)  The findings on examination were unchanged from her last visit.  (Tr. 420.)

Westfall's dosages of Abilify and Trintellix were increased.   (Tr. 421.)   Westfall saw Ms. Herina for follow-up on September 5, 2019.   (Tr. 65, 581.)   Her only complaint was daytime fatigue.   (Tr. 581.)   On examination, Westfall's mood and affect, behavior, judgment, and thought content were all normal.   (Tr. 583.)   Ms. Herina ordered a sleep study, and recommended weight loss, daily exercise, and smoking cessation.   (Tr. 584-85.)   On October 3, 2019, Westfall presented to Ms. McMillian for psychiatric follow-up.   (Tr. 65, 423.)   Westfall complained of fragmented sleep, and continued anxiety and depression.   (Tr. 423.)   She reported that she hears "mumbles" some days.   *Id.*   Westfall indicated that she had quit smoking marijuana two weeks prior, although she had used Xanax[6] she got from her mother. (Tr. 424.)   Upon examination, Westfall's stated mood was anxious/low, and her affect was full and appropriate to content.   *Id.*   Westfall was diagnosed with stable or improved schizoaffective disorder, bipolar type; and cannabis abuse, stable or improved.   (Tr. 425.)   Ms. McMillian discontinued the Trintellix and started Westfall on Prozac.[7]   At her November 14, 2019 follow-up appointment, Westfall reported no psychiatric complaints.   (Tr. 66, 592.)   Ms. Herina found that her mood, affect, behavior, judgment, and thought content were normal on examination. (Tr. 594.)   Westfall saw Ms. McMillian on December 4, 2019, at which time she reported that the Prozac was making her "fuzzy headed," her sleep continued to be fragmented, her energy was low, and she heard mumbles daily.   (Tr. 66, 427.)   She indicated that she had enjoyed spending time with family over Thanksgiving, and that her counseling with Compass had been helpful.   *Id.*   She had used marijuana twice since her last visit.   (Tr. 428.)   Westfall's stated

---

[6]Xanax is benzodiazepine indicated for the treatment of anxiety.   *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

[7]Prozac is indicated for the treatment of depression.   *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

mood was anxious, and her affect was full range and appropriate to content.   *Id.*   Ms.

McMillian increased her dosage of Abilify, and added Wellbutrin.[8]   *Id.*   At her February 5,

2020 follow-up appointment, Westfall reported that the Wellbutrin was helping with her energy

and that the increase of Abilify may be helping more with hearing "mumbles."   (Tr. 66, 432.)

On examination, Westfall's stated mood was "okay," and her affect was full range and

appropriate to content.   (Tr. 434.)   Ms. McMillian diagnosed Westfall with stable or improved

schizoaffective disorder.   *Id.*   She continued Westfall's medications, and advised her to

continue counseling.   (Tr. 435.)   Westfall saw a therapist at Compass the same day, and

reported that her depression and anxiety symptoms were improved.   (Tr. 441.)   She indicated

that she would like to "get out more" and had been thinking about applying for a job.   *Id.*

Westfall saw Ms. Herina for follow-up on April 2, 2020, at which time she was "doing well and

without complaints."   (Tr. 67, 628.)   On examination, she denied hallucinations and hearing

voices, and was not depressed or anxious.   (Tr. 67, 628-29.)   On April 9, 2020, Westfall

followed-up with Ms. McMillian via a telephone visit.   (Tr. 67, 609.)   She reported that she was

"doing okay, I guess," and noted that the pandemic has been stressful for her.   *Id.*   Westfall

indicated that she was worried about her friends and family getting sick, and her sleep was "not

very good."   *Id.*   She reported hearing "mumbles" briefly about every other day.   *Id.*   Ms.

McMillian increased Westfall's dosage of Prozac to help with "some increased difficulty with

anxiety."   *Id.*   At her therapy session the same day, her therapist recommended increasing the

frequency of sessions to help address her increased depression and anxiety symptoms stemming

from the pandemic.   (Tr. 614.)

---

[8]Wellbutrin is an antidepressant drug indicated for the treatment of depression and other mood disorders. *See* WebMD, http://www.webmd.com/drugs (last visited August 3, 2022).

After summarizing this medical evidence, the ALJ concluded that Westfall's statements about the limiting effects of her symptoms were inconsistent with the record.   (Tr. 67.)   She stated that Westfall has "not generally received the type of medical treatment one would expect for a totally disabled individual."   *Id.*   The ALJ explained that the record reveals relatively infrequent trips to the doctor, and objective findings have been "overwhelmingly normal with a few medication adjustments."   *Id.*   The ALJ acknowledged that Westfall has received various forms of treatment, such as medication and therapy, which would normally weigh in Westfall's favor.   *Id.*   She stated that the record, however, also reveals that the "treatment has been generally successful in controlling those symptoms."   *Id.*   Westfall argues that the ALJ's finding is erroneous, as Westfall received frequent treatment for her mental impairments, was hospitalized for her mental impairments around her alleged onset date, and the treatment records do not demonstrate control of her symptoms.

The undersigned finds that the ALJ properly assessed the severity and intensity of symptoms resulting from Westfall's mental impairments.   As Westfall points out, she was hospitalized for her mental impairments from April 5, 2019, through April 11, 2019, weeks prior to her alleged onset of disability date of May 1, 2019.   (Tr. 325.)   The ALJ discussed this hospitalization in detail, noting her symptoms of increased mood swings, hearing voices, irritability, and insomnia.   (Tr. 63.)   The ALJ also noted that Westfall had not received mental health treatment prior to this hospitalization, despite her report that she had experienced symptoms for over twenty years.   (Tr. 63, 329.)   Instead, Westfall reported that she had self-medicated with marijuana and alcohol.   (Tr. 329.)   A claimant's "failure to seek treatment" is not dispositive, though it certainly "may indicate the relative seriousness of a medical problem." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).   Westfall was prescribed medication

during her hospitalization and was stabilized, reporting no auditory or visual hallucinations at discharge.   (Tr. 64, 325.)

Subsequent to her hospitalization, Westfall received regular mental health treatment from Ms. McMillian at Compass and from her primary care nurse practitioner Ms. Herina.   These treatment notes reveal Westfall's mental health improved with medication and treatment, and was never as severe as it was during her April 2019 hospitalization.   *See Julin*, 826 F.3d at 1087 (evidence of relief from medication supports ALJ's findings that complaints were not fully credible); *Renstrom*, 680 F.3d at 1066 (conditions which can be controlled by treatment are not disabling); *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability").

For example, on May 6, 2019, Westfall's first follow-up appointment with Ms. Herina after her hospitalization, she denied experiencing hallucinations and her mental examination was normal.   (Tr. 552-53.)   Similarly, at her initial evaluation at Compass on May 21, 2019, Westfall's affect was anxious, but she denied auditory or visual hallucinations and her examination was otherwise normal.   (Tr. 337.)   She was assessed with stable or improved schizoaffective disorder and her medications were continued.   (Tr. 338.)   Later in May, Westfall was "doing well and without complaints."   (Tr. 64.)   In September, her only complaint was daytime fatigue (Tr. 581).   In November, she reported no psychiatric complaints and her mental examination was normal.   (Tr. 592, 594).   On some visits, Westfall complained of depression or anxiety, and reported hearing occasional "mumbles."   (Tr. 341, 352, 420, 423, 427.)   Her medications were adjusted at these times.   For example, in December 2019, Westfall's medication was adjusted after she reported worsening anxiety and mumbles, which resulted in improvement by her February 2020 visit.   (Tr. 430, 432.)   On February 5, 2020,

Westfall reported that her depression and anxiety symptoms were improved, and that she would like to get out more and apply for a job.   (Tr. 441.)   In April 2020, she was "doing well and without complaints."   (Tr. 628.)   Westfall's medication was adjusted again later in April, after she reported increased anxiety stemming from the pandemic.   (Tr. 609.)   This evidence supports the ALJ's finding that the medical evidence was not supportive of disabling mental health symptoms.

The ALJ next discussed Westfall's noncompliance with treatment recommendations. (Tr. 67.)   She stated that Westfall's failure to follow medical advice is more consistent with a tolerable and nondisabling degree of symptoms.   *See Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (plaintiff's failure to follow treatment recommendations valid reason to discredit subjective complaints).   The record reveals that Westfall was advised that complications could arise if illicit drugs were consumed along with her prescribed medications, but she continued to use marijuana throughout most of the relevant period.   (Tr. 337, 339, 342, 343, 420, 422, 426, 428, 433, 610.)   In July 2019, Westfall admitted she had not been taking her psychiatric medication due to an alleged inability to afford the medication.   (Tr. 341.)   She was counseled regarding the importance of taking her medications as prescribed and was given samples of medication.   *Id.*   Westfall also admitted to taking Xanax that was not prescribed to her.   (Tr. 424, 439.)   Thus, the ALJ properly considered Westfall's instances of noncompliance with treatment recommendations as a factor detracting from the reliability of her subjective complaints.

Westfall argues that the ALJ failed to properly consider whether Westfall was justified in not following prescribed treatment.   In support of this argument, she cites Social Security Ruling ("SSR") 82-59, entitled "Failure to Follow Prescribed Treatment."   This argument is

misplaced, as SSR 82-59 applies only in circumstances in which the claimant *would otherwise be found disabled* due to an unjustified failure to comply with treatment.   *See* SSR 82-59 (Ruling applies to claimants "with a *disabling impairment* which is amenable to treatment…") (emphasis in original).   Here, the ALJ did not find that Westfall's mental impairments were disabling. Rather, the ALJ properly considered Westfall's noncompliance with treatment recommendations as one factor detracting from the credibility of her allegations of disabling symptoms.

The ALJ next discussed Westfall's daily activities.   The ALJ stated that Westfall has alleged fairly limited daily activities, yet the record also indicates she spent time with family and friends, played cards, watched television, went to her daughter's home multiple times a week, and was considering getting a job.   (Tr. 68, 265-69, 352, 441.)   At Westfall's July 2019 consultation, Dr. Spencer noted that Westfall maintained her activities of daily living independently.   (Tr. 352.)   At that time, Westfall reported that she had no problem shopping at her local store, had friends come visit at her home, played cards, and enjoyed spending time with her children.   *Id.*   The ALJ did not err in finding Westfall's daily activities were not limited to the extent one would expect, given her complaints of disabling limitations.   *See Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (Significant daily activities may be inconsistent with claims of disabling pain).

In sum, the ALJ thoroughly reviewed Westfall's testimony and other evidence of record in a manner consistent with *Polaski*, and articulated specific reasons to find her symptoms and limitations were inconsistent with the record.   Because this determination is supported by good reasons and substantial evidence on the record as a whole, the undersigned must defer to it. *Julin*, 826 F.3d at 1086.

### 2.   Opinion Evidence and RFC

Westfall next argues that the ALJ erred in determining her RFC.   Specifically, she contends that the ALJ relied on the unsupported opinion of the state agency psychological consultant, Margaret Sullivan, Ph.D.   She also contends that the ALJ erred in evaluating the opinion of Ms. McMillian.

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

The ALJ found that Westfall had the RFC to perform work at all exertional levels with the following nonexertional limitations: limited to simple, routine, and repetitive tasks; cannot work at a production rate pace; only simple work-related judgments; only occasional interactions with supervisors and coworkers; no work with the general public; and no tandem tasks.   (Tr. 62.)   In making this determination, the ALJ assessed the consistency of Westfall's subjective complaints with the record as discussed above.   The ALJ also evaluated the medical opinion evidence.

A "medical opinion" is a statement from a medical source about what an individual can still do despite his impairments, and includes limitations or restrictions about the ability to perform physical, mental, sensory, and/or environmental demands of work.   20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).   Under the revised Social Security regulations,[9] the agency "[w]ill not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."   20 C.F.R. §§ 404.1520c(a), 416.920c(b)(2).   Instead, the ALJ must assess the persuasiveness of all medical opinions and prior administrative medical findings using a number of factors, including 1) the supportability of the opinion with objective medical evidence and explanations; 2) the consistency of the opinion with evidence from other medical and nonmedical sources; 3) the relationship of the provider to the claimant, including the length, nature and frequency of treatment; 4) the specialization of the provider; and 5) other factors, including the source's familiarity with the Social Security guidelines.   *See* 20 C.F.R. § 404.1520c.   The ALJ must explain how they considered the factors of supportability and consistency in their decisions but are not statutorily required to discuss the other factors.   20 C.F.R. § 404.1520c(b)(2).

State agency psychological consultant Dr. Sullivan completed a Mental Residual Functional Capacity Assessment on July 19, 2019.   (Tr. 112-15.)   Dr. Sullivan found that Westfall was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the

---

[9]The new regulations are applicable to Westfall's claims because she filed her appeal after March 27, 2017.   *See* 20 C.F.R. §§ 404.1520c, 416.920c.

general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.   (Tr. 113-14.)   Dr. Sullivan expressed the opinion that, "[w]ith compliance to treatment claimant can perform one/two step tasks with limit[ations] in interaction with [the] public and supervisors and with preparation for changes in environment."   (Tr. 114.)

The ALJ found Dr. Sullivan's opinions "persuasive," noting that they were "generally consistent with the medical evidence in the record," although she found the record "better supported a finding of mild limitations in understanding, remembering or applying information." (Tr. 68.)   The ALJ explained that the record did not "indicate any cognitive issues, she is able to live independently and did not require any assistance with daily activities."   *Id.*

The undersigned finds that the ALJ conducted a proper assessment of Dr. Sullivan's opinions.   Dr. Sullivan, as a state agency psychological consultant, is an expert qualified to provide opinions on a claimant's functional limitations based on a review of the record.   *See* 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (2017) (noting that state agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation).

Dr. Sullivan reviewed and summarized the medical records from Westfall's hospitalization at Center Pointe Hospital and the treatment notes from Compass.   (Tr. 110.) She also discussed Westfall's statements regarding her daily activities and limitations.   *Id.*   Dr. Sullivan noted that Westfall goes out alone, visits with family, shops in stores, does household chores, cooks simple meals, and lives independently; and that Westfall expressed difficulty with being around groups of people, dealing with stress, and dealing with authority.   *Id.*   Dr. Sullivan concluded that Westfall was capable of performing at least one/two step tasks with

limits in social interaction, as long as she was compliant with her prescribed treatment.   (Tr. 114.)   The medical evidence cited by Dr. Sullivan, the other medical evidence of record, and Westfall's statements support Dr. Sullivan's opinion that Westfall is capable of performing a limited range of work.

Further, the ALJ did not rely solely on Dr. Sullivan's opinion when determining Westfall's RFC.   Instead, she considered all of the medical and non-medical evidence of record when making her determination.   To the extent Westfall suggests that her RFC should have been determined or confirmed by a medical source, Westfall is mistaken.   As stated above, it is the ALJ's role to evaluate the record in its entirety, including medical opinions and testimony, and formulate a claimant's RFC based on all the relevant, credible evidence of record.   *See Perks*, 687 F.3d at 1092.

Finally, Westfall refers to a medical source statement completed by Ms. McMillian in June 2020.   Westfall argues that Ms. McMillian's opinion supports Westfall's allegations of difficulties in energy, concentration, and anxiety, which would affect her pace, and would result in the need to leave early, arrive late or be absent from work three times per month or more. She contends that, pursuant to the vocational expert's testimony, absences at this rate would preclude employment.

Ms. McMillian's opinion is dated June 23, 2020—twelve days after the ALJ's decision— and was not, therefore, considered by the ALJ.   (Tr. 46-50.)   Westfall submitted the evidence to the Appeals Council, but the Appeals Council found that the evidence "does not show a reasonable probability that it would change the outcome of the decision," and did not exhibit the evidence.   (Tr. 2.)

Where a claimant submits new evidence and "the Appeals Council considers the new evidence but declines to review the case, [federal courts] review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). In *Riley v. Shalala*, 18 F.3d 619 (8th Cir. 1994), the Eighth Circuit noted that a reviewing court:

> must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing. We consider this to be a peculiar task for a reviewing court.

*Id.* at 622.

The new evidence consists of a dozen pages (Tr. 40-52), of which only one page is legible (Tr. 50). On the only decipherable page, Ms. McMillian states that she has been treating Westfall since May 21, 2019, for diagnoses of schizoaffective disorder, panic disorder, cannabis abuse, and nicotine dependence, and that the limitations she sets out have been present since that date. (Tr. 50.) She states that Westfall has a history of auditory and visual hallucinations since childhood, times of hypomania, and chronic anxiety with chest tightness and occasional shortness of breath. *Id.* Ms. McMillian states that Westfall experiences some ongoing hallucinations and periods of high anxiety, which impact her concentration, social interaction, and task completion. *Id.* This information is consistent with Ms. McMillian's other reports that were fully considered by the ALJ. Therefore, the undersigned speculates that Ms. McMillian's June 23, 2020, report would not have changed the ALJ's assessment of Westfall's mental impairments.

The Court finds that, even when the new evidence is considered, substantial evidence supports the ALJ's RFC determination. Ms. McMillian indicates that the limitations she finds

in her opinion[10] have been present since May 21, 2019.   On that date, Ms. McMillian noted on examination that Westfall was alert, pleasant, cooperative, engaged, well-groomed, exhibited good eye contact, her speech was normal and coherent, her insight and judgment were fair, her thought process was linear and organized, her memory was grossly intact, her attention was grossly intact, her fund of knowledge was within normal limits, her intelligence appeared average, her affect was anxious but appropriate to content, and she was without auditory or visual hallucinations or paranoia.   (Tr. 337.)   Ms. McMillian assessed Westfall with "stable or improved" schizoaffective disorder.   (Tr. 338.)   These findings are not consistent with the presence of disabling symptoms.   On Westfall's subsequent visits to Compass, Ms. McMillian continued to note relatively normal findings on examination, such as pleasant and cooperative demeanor, good eye contact, organized thought process, and intact memory.   (Tr. 342, 420, 424, 428, 433.)   As previously discussed, Westfall occasionally reported increased symptoms to Ms. McMillian and Ms. Herina, which were addressed with medication adjustments.

The ALJ's RFC determination that Westfall remains capable of performing a limited range of simple, routine work, is supported by the record as a whole.   It is consistent with the opinion of the state agency psychological consultant, as well as the treatment notes of Westfall's various providers, which reveal Westfall's mental condition stabilized with medication and counseling.   The ALJ's determination is also supported by Westfall's testimony regarding her daily activities, her ability to work many years with her impairments, and her own stated desire to return to work.   The ALJ adequately incorporated Westfall's difficulties with social interactions and concentration in limiting her to only simple and routine work with very limited

---

[10]The limitations found by Ms. McMillian are not legible.   The undersigned will assume Plaintiff's representation of these limitations is accurate.

social interactions.   Westfall has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.


/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of September, 2022.